UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TERRY R. GETHERS,                   :
    Plaintiff,                      :
                                    :
v.                                  :          3:15-cv-00177 (VLB)
                                    :
ROBERT A. McDONALD,                 :
UNITED STATES OF AMERICA,           :          April 5, 2017
DEPARTMENT OF VETERANS              :
AFFAIRS VINS 1, OFFICE OF           :
EMPLOYMENT DISCRIMINATION           :
    Defendants.                     :

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. 33]

I.   **Introduction**

Plaintiff Terry Gethers ("Gethers" or "Plaintiff") brings this employment discrimination action against Defendants Secretary of the Department of Veteran's Affairs Robert A. McDonald, the Department of Veterans Affairs VISN-1, the Office of Employment Discrimination, and the United States of America (together, "Defendants") under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq*. The Defendant moved for summary judgment and Plaintiff filed an opposition. [Dkt. 33 ("Motion"); Dkt. 40 ("Opposition").] For the reasons that follow, Defendant's Motion is GRANTED in part and DENIED in part.

II.   **Factual Background**

The Department of Veterans Affairs provides healthcare to veterans nationwide through a network of hospitals. Motion at 3 (citing Department of Veterans Affairs, *Locations*, www.va.gov/directory/guide/division.asp?dnum=1

(last visited March 21, 2017).  The hospital network is divided into 23 regions

called Veterans Integrated Service Networks ("VISN").  *Id.*  Connecticut is in VISN-

1.  *Id.*

Plaintiff is an African American male; he was 54 years old in 2012.  [Dkt. 33-

13 (VA Discrimination Investigation Questionnaire of Gethers) ("Gethers' VA

Questionnaire") at 2.[1]]  He has a Bachelor of Science in electrical engineering

from the University of Bridgeport.  [Dkt. 33-3 (Deposition Transcript of Terry

Gethers ("Gethers Tr.") at 4.]  He has been employed by VISN-1 since 1990.  [Dkt.

33-3 (Deposition Transcript of Terry Gethers ("Gethers Tr.") at 2.]  He has spent

most of his tenure at VISN-1 as a biomedical engineer but also spent an eight and

a half year period working in the information technology department.  *Id.* at 3.

Gethers was appointed Acting Assistant Chief of Clinical Engineering for two

years, beginning in approximately November 2008 when the Assistant Chief fell

ill.  *Id.* at 8, 10.  He also assumed the role of Acting Chief of Clinical Engineering

around the same time.  *Id.* at 10.  Neither position required Gethers to "manage a

staff of people," but rather required "medical knowledge and IT knowledge."  *Id.*

at 12.  After serving as Acting Assistant Chief and Acting Chief of Clinical

Engineering he was not hired for either position on a permanent basis, but

instead "was asked to go back to [his] original position" as a "staff clinical

engineer."  Gethers Tr. at 26.  The parties have not provided the Court with the

basis for that decision.  Gethers received a positive performance evaluation for

---

[1] Not all exhibits attached to the parties' Summary Judgment briefing included
page numbers.  Accordingly, for consistency, all citations to page numbers refer
to Electronic Court Filing System pagination.

the period from October 1, 2010 to September 30, 2011.  [Dkt. 33-6.]  The parties have not provided the Court with Gethers' other performance evaluations. Gethers held a GS employment level of 13 throughout the relevant time period. [Dkt. 33-5 (Gethers Employment Profile) at 13.]

Christopher Falkner ("Falkner") is a Caucasian male who was 26 years old in 2012.  [Dkt. 33-7 (Deposition Transcript of Christopher Falkner) ("Falkner Tr.") at 6.]  He graduated with a Master's degree in clinical engineering from the University of Connecticut in 2010.  Falkner Tr. at 3-4.  Falkner explained that clinical engineering differs from biomedical engineering in that biomedical engineers focus on manufacturing to design medical devices while clinical engineering is the application of biomedical engineering in a clinical environment, such as working with physicians in a hospital using medical devices.  Id. at 2.  Falkner's degree included training in project management skills including "facilitation, leading meetings, creating documentation around timelines and budgets."  Id. at 3.  Falkner maintained a GS employment level of 12 throughout the relevant time period.  Id. at 14.

VISN-1 holds monthly meetings open, but not mandatory, to regional employees.  Gethers Tr. at 26.  Falkner regularly attended the monthly meetings through the relevant time period.  Falkner Tr. at 10.  Gethers attended regularly for a while, but stopped going as regularly because he "felt betrayed" when he was asked to go back to his original position as a staff clinical engineer after he ceased working as Acting Assistant Chief and Acting Chief of Clinical

Engineering.  *Id*.  He had also trained "every newly hired Engineer, Technician, and Intern at VA Connecticut."  Gethers' VA Questionnaire at 8.

At one of the monthly meetings (the exact date of which has not been provided to the Court), VISN-1 sought volunteers to help integrate new technology in VA network hospitals.  Falkner Tr. at 12.  It was "typical for VISN-1 . . . to seek volunteers from the region's hospitals' [Clinical Engineering] services to assist with new initiatives and special projects."  [Dkt. 33-8 (Second Declaration of Carolyn Mahoney) ("Mahoney Decl. 2") at 1.]  The project, ARK/CIS, stands for Anesthesia Record Keeping Clinical Information System, and is a "device integration platform" to "capture[] data from anesthesia equipment in the operating room, as well as from patient monitoring systems in . . . ICU areas."  Falkner Tr. at 5.

Falkner expressed interest in the ARK/CIS project to managers in the regional VISN-1 office, and as a result became involved in early coordination efforts.  Falkner Tr. at 12-13.  At a February 16, 2012 meeting, an announcement was made that Falkner would be "participat[ing] in the ARK/CIS project" by "help[ing] to coordinate with the national program office" in an informal capacity.  Falkner Tr. at 17.  Falkner emphasizes that the role of ARK/CIS manager "did not exist" at the time of the February meeting, and asserts the announcement only indicated he would be helping to coordinate with the national program office.  Falkner Tr. at 17.  He was not compensated for his involvement.  *Id*.

Gethers understood the announcement to convey that Falkner had "accepted the new ARK/CIS position" as manager.  Gethers Tr. at 21, 34.  Gethers

submits declarations of three employees present at the February 16, 2012 meeting who understood the announcement to convey that Falkner had been selected to take on a "new position" relating to the ARK/CIS project. [Dkts. 40-8, 40-9, 40-10.] None of the declarations specify whether the employees understood Falkner to be taking on a permanent management position or an informal coordination position. [Dkt. 40-10 (Declaration of Shakeela Nobles) at 2 (stating the announcement was that Falkner had been "selected to a new position as the VISN 1 ARK/CIS Coordinator"); Dkt. 40-9 (Declaration of Isaac McBride) at 2 (stating the announcement "congratulated Chris Falkner on his new position to VISN 1 ARK/CIS position"); Dkt. 40-8 (Declaration of Jeremiah Harrington) at 2 (stating the announcement mentioned "the promotion of Chris Falkner to the CIS-ARK position").]

Falkner was involved in "quite a bit of effort leading up to the region officially starting [the ARK/CIS] initiative," including aligning VISN-1 with the national framework and best practices. *Id.* at 12. On March 1, 2012, a Clinical Engineering Newsletter announced Falkner was the "New VISN1 CIS-ARK Coordinator." [Dkt. 33-9.]

The first job posting seeking a manager for the ARK/CIS project was posted on March 12, 2012. [Dkt. 33-29 (March 12, 2012 Job Posting) at 1.] The position was listed as requiring a GS employment level of 13. *Id.* The job description indicated the "Clinical Engineer" selected for the position would "provide[] professional engineering support to a complex, technically sophisticated, and service oriented Clinical Engineering Program," including

"healthcare technology strategic planning, pre-purchase assessment, acquisition support, implementation coordination, equipment management, training, and ongoing technical support activities" for the ARK/CIS initiative.  *Id.* at 2.  The selected individual would also advise "on healthcare technology matters to Network executive management, Network Program Officers, executive management at all medical centers and clinical service lines, and facility department directors" and provide "guidance to technical staff in all Clinical Engineering Programs across the Network."  *Id.*  Gethers did not apply to the ARK/CIS position because he understood it had already been filled by Falkner and his application would be futile.  Gethers Tr. at 24.

No qualified applicants applied to the position posted on March 12, 2012. [Dkt. 33-10 (Record of Position Applicants).]  Falkner did not qualify because he was only a GS level 12.  Accordingly, the vacancy announcement was canceled and the ARK/CIS management position remained unfilled.  *Id.*  The position was reposted as requiring a GS level of 12 or 13 on May 7, 2012 and included the same job description as the March 12, 2012 posting.  [Dkt. 33-11 (May 7, 2012 Job Posting) at 1.]  Gethers applied for the position.  [Gethers Tr. at 29; Record of Position Applicants.]  Of the six applicants for the May 7, 2012 job posting, only Gethers and Falkner were deemed qualified and interviewed for the position. Record of Position Applicants at 1.

Both Falkner and Gethers were interviewed for the position.  [Dkt. 33-15 (Falkner and Gethers Interview Questions).]  The interview was conducted via telephone.  [Dkt. 33-16 (VA Discrimination Investigation Questionnaire of Jason

Atkins) ("Atkins' VA Questionnaire") at 2.]  Both candidates were asked the same preselected questions during their interviews including, for example: "What is your experience with medical information systems?" and "How would you describe your leadership style within a team?"  Falkner and Gethers Interview Questions at 1-4.  The interview questions and a comparison of each interview panelist's notes regarding the candidates' responses are included in a table at Appendix A to this Decision.  Gethers "thought the interview questions were very relevant, and appropriate, and it provided an opportunity for [him] to display [his] in depth knowledge of the subject matter.  Gethers' VA Questionnaire at 3.

When asked about the hiring process after Gethers filed his internal discrimination complaint, all three panelists denied that Gethers' age or race were factors in Falkner's appointment to the ARK/CIS management position.  [Atkins' VA Questionnaire at 5; Dkt. 33-17 (VA Discrimination Investigation Questionnaire of Paul Neuhaus) ("Neuhaus' VA Questionnaire") at 3; Dkt. 33-24 (VA Discrimination Investigation Questionnaire of Donald Morge) ("Morge's VA Questionnaire") at 4.]  Only one interview panelist professes he was unaware of Gethers' age or race until Gethers filed his Administrative Complaint, emphasizing the interview took place over the phone.  Atkins' VA Questionnaire at 2. Morge, who scored Falkner very highly in virtually all categories, was the most critical of Gethers and did know Gether's age and ethnicity.  Morge's VA Questionnaire at 2.  Rather, panelists assert they chose Falkner for the position because of his communication skills, ability to "manage troubled relationships with coworkers," ability to translate technical language into "lay person

language," project and management experience, and understanding of the flow of computer-based systems form the medical device to the patient's medical record. Atkins' VA Questionnaire at 4; Neuhaus' VA Questionnaire at 3; Morge's VA Questionnaire at 4.  The official in charge of final selection for the position also denies that race or age was a factor in Falkner's appointment, and instead cites Falkner's Master's degree, project experience, and experience working with other VISN managers as the basis for his selection.  Dkt. 33-18 (VA Discrimination Investigation Questionnaire of Carolyn Mahoney) ("Mahoney's VA Questionnaire") at 3-4.]

Gethers received a formal notice from the Department of Veterans Affairs on July 3, 2012 indicating he was not selected for the position.  Dkt. 33-19 (Notice) at 2.].  On July 17, 2012, the Department of Veterans Affairs circulated an announcement that Falkner had accepted the position.  [Dkt. 33-20.]  On August 2, 2012, Falkner was formally reassigned to the ARK/CIS position.  Falkner Tr. at 14.

Gethers initiated contact with an EEO counselor on August 3, 2012 and received a Notice of Right to File a Discrimination Complaint on July 3, 2012. [Dkt. 33-12 (Notice of Acceptance of Administrative Complaint) at 1.]  On November 1, 2012, Gethers filed a formal discrimination complaint asserting he "was discriminated against on the bases of age and race (Black) when: On July 3, 2012, the complainant was informed that he was not selected" for the ARK/CIS management position.  [*Id.*; Dkt. 33-22 (Administrative Complaint).]

In January 2013, Falkner left VISN-1 and the ARK/CIS management position was reposted.  [Dkt. 40-26 (January 30, 2013 Job Posting).]  Gethers again applied

for the position, but the job posting was "cancelled or postponed" on March 19, 2013.  Gethers' VA Questionnaire.  Mr. Cheng Ben-Zhang, previously an intern, was transitioned into the role of "ARK/CIS Project Lead" on April 16, 2013.  [*Id.* at 6; Dkt. 40-38 (April 16, 2013 Job Announcement).]  Mr. Ben-Zhang is an Asian male who was under 30 years old in 2013.  *Id.*  He was not hired from an open job posting, but rather was transitioned into the role from an internship.  *Id.*

III.    <u>Standard of Review: Motion for Summary Judgment</u>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion."  Fed. R. Civ. P. 56(a).   In order to prevail, the moving party must sustain the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought.  *Id.*  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (quotation omitted).  In addition, "the court should

not weigh evidence or assess the credibility of witnesses" on a motion for summary judgment, as "these determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment 'cannot defeat the motion by relying on the allegations in [her] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.' At the summary judgment stage of the proceeding, [p]laintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (quoting *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir. 1996)). "Summary judgment cannot be defeated by the presentation . . . of but a 'scintilla of evidence' supporting [a] claim." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (quoting *Anderson*, 477 U.S. at 251).

A court must make the threshold determination of whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. Judges are not required "to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the

jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Anderson*, 477 U.S. at 251 (citing *Pennsylvania R. Co. v. Chamberlain,* 288 U.S. 333, 343 (1933); *Coughran v. Bigelow,* 164 U.S. 301, 307 (1896)). Indeed, summary judgment should be granted where the evidence is such that it "would require a directed verdict for the moving party." *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624 (1944).

"A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). A party may also support their assertion by "showing that the materials cited do not establish the absence . . . of a genuine dispute." *Id.* Cited documents must consist of either "(1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." Local R. Civ. P. 56(a)3; *see also* Fed. R. Civ. P. 56(c)(4).

The Court need not consider any materials that the parties have failed to cite, but may in its discretion consider other materials in the record. Fed. R. Civ. P. 56(c)(3). If a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact, the Court may grant summary

judgment on the basis of the undisputed facts.  D. Conn. L. Rule 56(a)(3) (stating that "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with [Local] Rule 56(a)(1) or in the Court imposing sanctions, including . . . an order granting the motion if the undisputed facts show that the movant is entitled to judgment as a matter of law").

In addition, when a plaintiff is proceeding pro se, the defendant moving for summary judgment must provide the pro se plaintiff with an "easily comprehensible notice" as to the "nature and consequences of a summary judgment motion."  *M.B. v. Reish*, 119 F.3d 230, 232 (2d Cir. 1997).  Defendant has done so here, and Plaintiff has responded with a memorandum of law and 31 evidentiary exhibits (and seven non-evidentiary exhibits such as a re-filed Statement of Disputed Issues of Fact).  Accordingly, the Court proceeds to evaluate the Motion notice of which was properly given.  *Id.* at 232 (finding pro se Plaintiff understood Defendant's Notice of Summary Judgment filing where Plaintiff filed a memorandum of law opposing summary judgment and 104 pages of exhibits).

Finally, "it is well established that the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006).  When a party exercises his or her "right of self-representation," the Court is obliged to "make reasonable allowances to protect pro se litigants from

inadvertent forfeiture of important rights because of their lack of legal training." *Id*. at 475 (citing *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

IV.   <u>Discussion</u>

Defendants challenge Plaintiff's claims on three grounds: failure to exhaust administrative remedies, inclusion of improper defendants, and failure to assert a question of fact whether Defendant's hiring justifications were pretextual.   The Court evaluates each argument in turn.

a.   <u>Exhaustion of Administrative Remedies</u>

Defendants argue the only adverse action at issue is the May 7, 2012 vacancy announcement to which Plaintiff applied and was not selected.   Motion at 7-8.   The Court does not read Plaintiff's Complaint as attempting to assert other adverse actions that were not administratively exhausted, but to the extent the Complaint could be interpreted as raising other adverse actions, the Court addresses them here.

Both Title VII and ADEA claims must be administratively exhausted in order to bring a civil claim.   42 U.S.C. § 2000e-16(c) (concerning race discrimination claims); 29 U.S.C. § 633a(d) (concerning age discrimination).   Claims that are "reasonably related" to allegations in an administrative complaint are also considered administratively exhausted.   *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008).   A claim is "reasonably related" if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."   *Id*.   However, an administrative complaint asserting discrimination on the basis of a certain

protected class is not reasonably related to later claims of discrimination on the basis of membership in other protected classes *Clarke v. White Plains Hosp.*, 650 F. App'x 73, 75 (2d Cir. 2016) (finding not administratively exhausted claims of race, national origin, and age discrimination where the administrative complaint alleged only disability and "genetic predisposition" discrimination, but all allegations were based on the same workplace event (*see* S.D.N.Y. Opinion, 2015 WL 13022510, for further facts)).

Plaintiff's Complaint of Employment Discrimination filed with the Department of Veterans Affairs asserts age discrimination based on Falkner's pre-selection for a job.  [Dkt. 33-22 (Administrative Complaint) at 1.]  Plaintiff asserts in his Administrative Complaint that Falkner "was offered the job in February of 2102, and the same job was posted in March 12, 2012."  *Id.*  He explains he "didn't apply for the job in March 2012 because [he felt the] selection announcement had already been made."  *Id.*  He also notes the "same job was posted again in May 2012," and he applied for that opening because he "thought the second posting was an additional job."  *Id.*  Falkner (the "original selected" applicant) was awarded the position.  *Id.*  Gethers purposefully omitted an allegation of discrimination on the basis of race from his Administrative Complaint: "In the very beginning, I stayed away from the race card, because I did not want to believe that these people that I work with thought like that." . . . I said more – that I thought it was more age, you know, as opposed to race."  Gethers Tr. at 33.  However, at some point during the Administrative Complaint process, Gethers made clear that he alleged both age and race discrimination.  [Dkt. 33-12

(Notice of Acceptance of Administrative Complaint).]  By February 11, 2013, the Department of Veterans Affairs gave Notice it had accepted Gethers' Administrative Complaint alleging he was "discriminated against on the bases of age and race (Black) when: On July 3, 2012, the complainant was informed that he was not selected" for the ARK/CIS management position.  *Id*.

Because Gethers' complaints of age and race discrimination based on the May 7 vacancy announcement and corresponding July 3, 2012 hiring decision were accepted, investigated, and processed by the Department of Veterans Affairs Office of Resolution Management, the Court deems those claims were administratively exhausted for the purpose of this action.  To the extent Gethers seeks to raise any other allegations of discrimination in his Complaint those allegations were not raised or adjudicated administratively and therefore are not administratively exhausted and must be dismissed.

> **b.  Claims Against Improper Defendants**

All claims under Title VII or ADEA must be raised against the head of the offending agency.  42 U.S.C. § 2000e-16(c) (stating a complainant may raise an administratively exhausted claim of race discrimination against the "head of the department, agency, or unit"); *Tennant v. U.S. Bureau of Prisons*, 3:02-cv-00558, 2003 WL 1740605, at *2 (D. Conn. Mar. 29, 2003) (dismissing certain defendants because the "only proper defendant in an age discrimination suit against a federal employer is the head of the federal agency"); *Varville v. Rubin*, 3:96-cv-00629, 1998 WL 681438, at *6 (D. Conn. Aug. 18, 1998) (same).  The head of the Department of Veterans Affairs, Plaintiff's employer, is the Secretary of Veterans

Affairs.  All claims against Defendants other than former Secretary of Veterans

Affairs Robert A. McDonald must be dismissed.

> **c.  <u>Plaintiff's Age and Race Discrimination Claims</u>**

To state a claim for race or age-based employment discrimination, a

complainant must establish a prima facie case of racial discrimination by

showing:

> (i)     that he belongs to [a protected group];
> (ii)    that he applied and was qualified for a job for which the employer was seeking applicants;
> (iii)   that, despite his qualifications, he was rejected; and
> (iv)    that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Byrne v. Cromwell,*

*Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) (superseded other grounds) (stating

the *McDonnell* proof framework applies race discrimination claims under Title VII

as well as age discrimination claims under ADEA).  If the complainant makes out

a prima facie case, the burden then shifts to the employer to "articulate some

legitimate, nondiscriminatory reason for the employee's rejection.  *Id.* at 802-03.

If employer does so, the burden shifts back to the complainant to show the

employee's legitimate, nondiscriminatory reason is a pretext for prohibited

discrimination.  *Id.* at 804.  To establish pretext, the complainant may raise "facts

as to the [employer's] treatment of [complainant] during his prior term of

employment; [the employer's] reaction, if any, to [complainant's] legitimate civil

rights activities; and [the employer's] general policy and practice with respect to

minority employment."  *Id.* at 804-05.

Where a complainant shows a prima facie case and the employer raises a legitimate, non-discriminatory purpose for the hiring decision, but the complainant "cannot offer direct evidence of an improper discriminatory bias," the complainant must rely on the "strength of his prima facie case combined with circumstantial evidence that [the employer's] stated reason for failing to hire [the complainant] is pretext" in order to defeat summary judgment. *Byrne*, 243 F.3d at 102. The Court "must respect the employer's unfettered discretion to choose among qualified candidates," and "does not sit as a super-personnel department to reexamine a firm's business decisions about how to evaluate the relative merits of education and experience in filling job positions." *Id.* at 103; *Newsom-Lang v. Warren Int'l, Inc.*, 80 F. App'x 124, 126 (2d Cir. 2003). However, "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision." *Id.* Where the "credentials of the person selected for the job" are such that "no reasonable person . . . could have chosen the candidate selected over the plaintiff," the employer's hiring decision may not stand. *Barry v. New Britain Bd. of Educ.*, 300 F. App'x 113, 114 (2d Cir. 2008) (citing *Byrne*, 243 F.3d at 103).

The record includes evidence establishing the prima facie factors: Gethers is a member of two protected classes in that he is African American and was 54 years old at the time in question. Gethers' VA Questionnaire at 2. He applied and was deemed qualified for the May 7, 2012 job posting. Gethers Tr. at 29; Record of Position Applicants at 1. Despite his qualifications, Gethers was notified on July 3, 2012 that he was not selected for the position. Notice at 2. After Gethers'

rejection, Falkner was formally appointed to the position of ARK/CIS manager on July 17, 2012. [Dkt. 33-20.]

Defendant does not challenge whether Gethers has established a prima facie case of age or race discrimination based on the May 12, 2012 hiring decision. Motion at 16. Rather, Defendant asserts he has raised a legitimate, nondiscriminatory reason for the hiring decision which Gethers has failed to establish was a mere pretext for discrimination. *Id.* Specifically, Defendant argues Gethers was not chosen for the ARK/CIS management position because "he did not outperform the other candidate in the selection process." Motion at 16. Defendant cites Falkner's Master's degree which involved training in project management, voluntary assistance with the beginning stages of the ARK/CIS initiative, and project management experience as the basis for his employment. Falkner Tr. at 3-4, 12-13. The panelists and final decision-maker for the ARK/CIS position asserted during the VA investigation into Gethers' Administrative Complaint that they chose Falkner based on his education, communication and management skills, project management experience, and understanding of the types of technological systems that were the basis of the ARK/CIS program. Atkins' VA Questionnaire at 4; Neuhaus' VA Questionnaire at 3; Morge's VA Questionnaire at 4; Mahoney's VA Questionnaire" at 3-4. The panelists' notes from the interviews themselves also indicate Falkner's interview answers demonstrated "good understanding of projects," "good understanding of where technology is going," "good demonstration of logic and communication," and

ability "to lead in midst of disagreement."  Falkner and Gethers Interview Questions at 1-2.

By contrast, the panelists' notes from Gethers' interview indicate "no knowledge of overall position" and failure to "demonstrate leadership."  *Id*. at 3-4. Panelist Atkins noted "concern about [Gethers'] ability to communicate in [a] non-technical way to clinicians."  *Id*.

Gethers asserts Defendant's legitimate, nondiscriminatory reason for hiring Falkner is mere pretext for age and race-based discrimination.  Gethers believes it is "not possible" that Falkner was best qualified for the promotion in question because Gethers has "bailed [Falkner] out quite a few times" and "every time there's a technical issue, . . . they call [Gethers]."  *Id*. at 14.  Gethers elaborated that he has "bailed [Falkner] out" by working with him on the bar code medication administration to prevent loss of data.  *Id*. at 14-15.  Gethers reiterated throughout his deposition that he "think[s] Mr. Falkner was preselected because of his race . . . [and] age" "because of [Gethers' superior] qualifications."  *Id*. at 36.  In other words, Gethers thinks that Faulkner must have been chosen for an impermissible reason because he was more qualified than Falkner.

In further support of Gethers' preselection theory, he argues the interview panel was less likely to appoint anyone but Falkner once he was participating in ARK/CIS conference calls regularly, reasoning "why would you change the quarterback in the fourth quarter?"  Gethers Tr. at 31.  He asserts the members of the hiring panel also participated in the ARK/CIS coordination conference calls, but provides no documentation establishing their participation in the conference

calls. *Id*. at 30-31.  He asserts those individuals should have recused themselves from the hiring panel. *Id*. at 31.  Gethers offers no reason other than Falkner's age and race why Falkner may have been considered more qualified for the promotion.

Gethers does however argues he was discriminated against on the basis of his age and race because he is "the only African American engineer, male engineer over 40, . . . in VISN-1" and he has "applied for five jobs and . . . been denied all five jobs." *Id*. at 34.  Gethers elaborated that the five jobs for which he unsuccessfully applied were "assistant chief, chief of clinical engineering, RTLS manager, ARK/CIS manager, and – well, the medical one.  I never got a chance to apply for that one. . . . but I had applied for the ARK/CIS twice." *Id*. at 34.  Gethers also asserts there is "no one of color" in "the whole management" of VISN-1.  *Id*. at 36.  In addition, "all of the hires in the past 2 years for VISN 1 Clinical Engineering Consolidated Program are all under thirty (30) years of age, and all have accelerated in 2-3 years."  Gethers' VA Questionnaire at 12.

Gethers also admits Falkner "is a smart guy . . . He's very bright . . . And for me to sit here and say that no one can do that job but me is ludicrous, because that is not the case . . ." *Id*. at 16.  When asked whether the interview panel discriminated against him on the basis of his race, he responded "I don't know what it is, why they did it." *Id*. at 31-32.  When asked whether the interview panel discriminated against him because of his age, Gethers answered "I don't know." *Id*. at 33.  Gethers does not assert anyone at VISN-1 has "ever said or done

anything that [he] took to be racist," although he elaborated that "someone who is racist, I mean, they can mask it pretty well.  You never know."  *Id.* at 37.

The Court finds the interview panelists' and final decision-maker's responses to VA investigation questioning unpersuasive given their timing: Gethers received a formal notice from the Department of Veterans Affairs on July 3, 2012 indicating he was not selected for the position.  [Dkt. 33-19 (Notice) at 2.]. On July 17, 2012, the Department of Veterans Affairs circulated an announcement that Falkner had accepted the position. [Dkt. 33-20.] On August 2, 2012, Falkner was formally reassigned to the ARK/CIS position. Falkner Tr. at 14. Gethers initiated contact with an EEO counselor on August 3, 2012 and received a Notice of Right to File a Discrimination Complaint on July 3, 2012. [Dkt. 33-12 (Notice of Acceptance of Administrative Complaint) at 1.] On November 1, 2012, Gethers filed a formal discrimination complaint asserting he "was discriminated against on the bases of age and race (Black) when: On July 3, 2012, the complainant was informed that he was not selected" for the ARK/CIS management position. [Id .; Dkt. 33-22 (Administrative Complaint).]  The investigation questionnaire responses were not completed until April 2013, approximately ten months after the hiring process and six months after Gethers lodged his first complaint. Atkins' VA Questionnaire; Morge's VA Questionnaire; Neuhaus' VA Questionnaire; Mahoney's VA Questionnaire.  They do not represent present sense impressions.  Fed. R. Evid. 803(1) ("A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is "not excluded by the rule against hearsay."); *see also, e.g., Kokoska v.*

*Hartford*, 2014 WL 4724879, at *1 (D. Conn. Sept. 23, 2014) (excluding statement describing a prior event because it was not written "while or immediately after" the author experienced the event, explaining "the key to this hearsay exception is the time factor"). Even if they fell within a hearsay exception, the hiring officials' statements were made once the discrimination investigation had begun and are inconsistent with the record as a whole. The Court concludes that a trier of fact may not find them credible.

Unfortunately, the interview panelists' notes made at the time of Falkner and Gethers' interviews are not nearly as clear or thorough as the panelists' answers to the investigation questionnaire. As is evidenced by the chart attached at Appendix A, evidence of Falkner and Gethers' actual interview responses is scant. The Court notes that Defendant's failure to better document the basis for its hiring decision at the time is suspect.

The Court focuses on the limited records provided from the time of the hiring decision. The panelists did not thoroughly record each interviewee's answers, but rather wrote sporadic notes that are difficult to decipher. Falkner and Gethers Interview Questions. However, the Court can draw certain conclusions based on those limited notes and the record as a whole. *Id.* For example, the first question asked for the applicant's understanding of the duties of the ARK/CIS management position. *Id.* It appears both Falkner and Gethers discussed the need to collaborate with the Office of Information Technology ("OIT"), Informatics (data processing), and Clinical Engineers ("CEs"). *Id.* Falkner also mentioned the position would involve preplanning and follow-up, but

did not elaborate. *Id.* The panelists found Falkner had a "good understanding" of the projects, roles and responsibilities of CEs, OIT, and Informatics (which appears to be a separate department), and gave his first answer a combined score of 13 (each question appears to have had a maximum possible score of 15, with each panelist rating the answer out of 5). *Id.* The panelists found Gethers showed a "limited understanding of the position and system it supports," and gave his answer a combined score of 9.5. *Id.* The Court can discern no substantive difference between the two applicants' answers to Question One which justify such disparate reactions.

One of the most striking disconnects between the applicants' answers and the panelists' scores occurred at Question Four, which asked applicants to describe their experience with medical information systems. *Id.* Falkner noted his involvement in starting the ARK/CIS system and "limited experience" with other technology. *Id.* He discussed his "lack of training" with interfaces but "knowledge of who to bring to the table." *Id.* Gethers described working with OIT to get a technological program to "communicate to" medical imaging technology and other programs. *Id.* It is also known from the record that Gethers' experience includes two years as Acting Assistant Chief and Acting Chief of Clinical Engineering. Gethers Tr. at 8-10. The panelists noted Falkner's "limited involvement" with medical information systems and "minor experience," and gave him a score of 9. Falkner and Gethers Interview Questions. The panelists noted Gethers has a "good understanding" of technology but "does not know what [the ARK/CIS] project is" and "drifted" in his answer. *Id.* They gave him a

score of 7.  *Id*.  The disparity between the two candidates' scores and their experience with medical information systems, including how they conveyed that experience in response to question four, is irreconcilable.  In fact, the panelists did not attempt to explain why they viewed Gethers' experience with medical information systems warranted a lower score, but instead focused on Gethers' lesser understanding of the ARK/CIS project.  While Falkner may have had a greater understanding of the ARK/CIS project due to his involvement with its early implementation, the scope of the question was "experience with medical information systems" – an area where Gethers, with decades of experience including leading the Clinical Engineering department, is the stronger candidate.  *Id*.

Similarly, Question Nine asked the applicants to describe their leadership style within a team.  *Id*.  Falkner stated his leadership style is to work as a member of the team and speak up if he disagrees.  *Id*.  As an example, he described a time he worked on a project with clinical staff and vendors and identified issues to resolve through "controlled," respectful conflict.  *Id*.  Gethers discussed his tenure as Acting Chief and Acting Assistant Chief of Clinical Engineering and stated he leads by gaining the respect of his peers and staff who may be reluctant to change.  *Id*.  The panelists noted Falkner was a "member of the team" and could "lead in [the] midst of disagreement" and gave him a leadership score of 12.  *Id*.  The panelists asserted Gethers gave "poor leadership examples" and "did not demonstrate leadership but rather a peer relationship," and gave him a score of 6.5.  *Id*.  The panelists' conclusion that Gethers'

discussion of his time as an Acting Chief and Acting Assistant Chief of a department was a "poor leadership example," but that Falkner's ability to be a "member of the team" showed stronger leadership skills, is illogical. *Id.*

The Court need not discuss all nine interview questions and panel evaluations; they are consistent with those previously described. The discrepancy between the panelists' assessments and the applicants' interview responses, combined with the record as a whole, creates a question of fact whether the Defendant's hiring decision was legitimate and non-discriminatory, or was a mere pretext for discrimination.

While the Court respects Defendant's authority to determine who is qualified to fill its positions and is not supplanting its judgment for that of Defendant; it finds that a jury may find that Defendant's non-discriminatory reasons are pretextual both because of their content (or lack thereof) and their timing.

Other record evidence creating a question of fact includes Gethers' service as Acting Assistant Chief and Acting Chief of Clinical Engineering for two years, after which he was "asked to go back to [his] original position" as a "staff clinical engineer," and the Court has been provided no evidence explaining why he was not retained in those leadership positions permanently. Gethers Tr. at 26. In addition, Gethers testified in his deposition that he "stepped in" and "wrote up the SOW, the scope of work, everything" for an initiative involving the "bar code medication administration system" because Falkner "wasn't getting [it] done." *Id.* at 15. Gethers has also testified that he "bailed [Falkner] out" by solving

"serious issues" with a "neurology server" that had been "losing data . . . for patients." *Id.* at 14. Gethers also noted in his investigation questionnaire that he has trained "every newly hired Engineer, Technician, and Intern at VA Connecticut." Gethers' VA Questionnaire at 8. Finally, Gethers asserts there is "no one of color" in "the whole management" of VISN-1 and "all of the hires in the past 2 years for VISN 1 Clinical Engineering Consolidated Program are all under thirty (30) years of age, and all have accelerated in 2-3 years." Gethers Tr. at 36; Gethers' VA Questionnaire at 12. All of this evidence, combined with the incongruous reasoning behind the interview panel's assessments, calls into question whether the Defendant's basis for his hiring decision was indeed legitimate and non-discriminatory.

Conversely, the Court also cannot conclude definitively at this juncture that Defendant's hiring decision was a mere pretext for discrimination. There are facts in the record supporting Falkner's appointment. Falkner holds a Master's degree in Clinical Engineering with specific training in project management. Falkner Tr. at 2-3. The May 7, 2012 job posting suggests Falkner's degree lent particularly relevant training, as the ARK/CIS manager would provide "professional engineering support [for] a technically sophisticated, and service oriented Clinical Engineering Program" and "executive management at all medical centers." By contrast, Gethers holds a Bachelor of Science in Electrical Engineering. Gethers Tr. at 4. However, Gethers has spent over twenty years working at VISN-1 as a biomedical engineer and in the information technology department. *Id.* at 2-3. Whether Falkner's advanced, specialized degree made

him more qualified for the ARK/CIS management position than Gethers' degree in a different area of engineering and many years of experience is not discernable from the record before the Court; therefore there is a question of fact for a jury. Defendant's Motion for Summary Judgment on Gethers' age and race discrimination claims based on the May 7, 2012 job posting must be denied.

Gethers' preselection claim, however, cannot survive summary judgment. The call for volunteers to help coordinate the initial stages of the ARK/CIS program was announced at a monthly VISN-1 meeting which Gethers could have attended. Falkner Tr. at 12. The record indicates anyone could have volunteered to help integrate the new ARK/CIS technology, and Gethers did not. *Id*. Consequently, Falkner, who did volunteer, became familiar with the ARK/CIS system and those involved in its implementation through approximately six months of conference calls and coordination efforts between his appointment as a volunteer coordinator and his appointment as permanent manager. *Id*. Gethers has presented no evidence suggesting others could not have volunteered to help with the early implementation of the ARK/CIS program as Falkner did, or that Falkner's voluntary early participation was an impermissible guarantee that he would be appointed to the eventual ARK/CIS management position. If the interview panel found Falkner's voluntary assumption of early ARK/CIS responsibilities made him a stronger applicant for the manager position, it was a valid consideration which Gethers has tacitly acknowledged. *Id*. Falkner took it upon himself to become familiar with the new technology while Gethers chose not to avail himself of that opportunity. It would not be discriminatory

preselection to choose such a candidate for a job based on his initiative and familiarity with relevant technology.  Summary judgment is GRANTED as to Gethers' preselection claim.

V.    <u>Conclusion</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's preselection claim.  Defendant's Motion for Summary Judgment is DENIED as to Plaintiff's age and race discrimination claims based on the May 7, 2012 job posting raised against the Secretary of Veterans Affairs.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  April 5, 2017